**Sabrina GALLON, Plaintiff,**

v.

**HUSTLER MAGAZINE, INC., Defendant.**

**No. 84–CV–353.**

United States District Court, N.D. New York.

March 12, 1990.

Order March 23, 1990.

Sovik, Kendrick, Schwarzer & Sugnet, P.C., Syracuse, N.Y. (Michael Paul Ringwood, of counsel), for plaintiff.

Lombardi, Devorsetz, Stinziano & Smith, Syracuse, N.Y. (Frank Bersani, of counsel), Eric M. Alderman, Syracuse, N.Y. (Eric M. Alderman, of counsel), for defendant.

## MEMORANDUM/DECISION/ORDER

McAVOY, District Judge.

The case presently before this Court is an action brought by Ms. Sabrina Gallon to recover damages for injuries sustained to her as a consequence of the publication of a picture of Mrs. Wood in the October 1983 edition of *Hustler* magazine without her consent. On April 11, 1989, plaintiff withdrew her demand for a jury trial and the parties agreed to submit the issues of proximate cause and damages to the Court to decide. At that time the Court instructed counsel to submit findings of fact and conclusions of law, with the previous record for the Court's review. Having duly considered all relevant evidence, the Court now makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Plaintiff, Sabrina Gallon, was born March 14, 1961. At the time of this action, she was twenty-six years of age and resided in Jamaica, Queens, New York, where she had resided all her life. In June 1979, Plaintiff graduated from the New York School of Printing High School and first entered Syracuse University (hereinafter "Syracuse") in July of 1979.

2. Defendant Hustler Magazine, Inc. is an Ohio corporation that is qualified to do business in California and New York. Its principal place of business is in Los Angeles, California, from which it publishes *Hustler* magazine. *Hustler* is commonly known in the industry as a "men's sophisticate magazine." A substantial portion of every issue is devoted to sexually explicit material.

3. In September of 1979, Plaintiff met Waldo Waldron Ramsey (hereinafter "Ramsey") and started dating him soon

Rinaldi, Rinaldi & Cognetti, Syracuse, N.Y. (Ralph A. Cognetti, of counsel), Smith,

after. In December of 1980, the Plaintiff started living with Ramsey and did so until June of 1982. In June of 1982, Plaintiff became a Higher Education Opportunity Program (hereinafter "HEOP") peer tutor which required her to live in University housing.

4. In the spring of 1982, prior to that summer, the nude photos in question were taken by Ramsey in the couple's apartment. No facts exist that would show that the Plaintiff was aware that the photos would be sent to any magazine.

5. When the Fall, 1982 semester began, Plaintiff moved back into the off-campus housing complex in which she had lived the prior year. In December of 1982, the Plaintiff was physically and sexually abused by Ramsey during a one and one half day ordeal during which she was held against her will. The plaintiff did not return to Syracuse for the Spring 1983 semester, but instead, returned home and enrolled at St. John's University. The Plaintiff did return to Syracuse in January 1983 for student disciplinary hearings against Ramsey arising from the December 1982 event.

6. The Plaintiff returned to Syracuse in the Summer of 1983 with her sister to repeat some academic courses. In September of 1983, the Plaintiff returned to Syracuse to start the Fall semester when she was told by friends Nancy Nieves and Jackie Bigelow that her nude photos had appeared in *Hustler* magazine that month.

7. The nude photograph of Sabrina Gallon along with the accompanying caption, appeared in the Hustler Magazine's National and International editions for October of 1983. The section of *Hustler* in which Ms. Gallon's picture appeared was called "Beaver Hunt". "Beaver Hunt", a collection of snapshots of nude models by amateur photographers, is a monthly feature of the magazine.

8. In January of 1983, Michael Heimowitz was hired as a researcher for defendant, *Hustler* Magazine, Inc. He is the researcher that reviewed and handled the verification regarding the photograph and model release form of Sabrina Gallon.

9. Mr. Heimowitz acknowledged that it was his responsibility to protect people from the publication of photographs that they did not wish or intend to have published. He also stated that if there was any reason to believe that the photograph or model release form was not authentic, it was to be immediately eliminated from consideration. This was the policy and protocol as he understood it when he worked in the defendant's Research Department.

10. Mr. Heimowitz stated in his deposition testimony that it was part of his practice in reviewing these documents to observe the type of writing and the manner in which it was written. After receiving and reviewing the application and photograph, he sent out a mailgram to the address contained on the model release form. The mailgram was a document which solicited a telephone call in order to verify the information contained in the release form. It is apparent from his deposition testimony that Mr. Heimowitz not only failed to take any precautions which might have alerted him to the fact that the model release form as well as the signature contained therein were forgeries, but he had no knowledge of any reasons for the existence of such precautionary measures. Furthermore, when questioned concerning the various inconsistencies evident in a review of the model release form, he stated that he "did not recall formulating any impressions".

11. The Court has grave doubts about the adequacy of Hustler's verification process. The publication of a photograph of someone in the nude is a highly sensitive matter. The validity of the releases of "Beaver Hunt" models should be of particular concern since snapshots are not ordinarily intended for publication. Nevertheless, the verification process used by Hustler at the time provided no confirmation of the information contained in the release by an independent source. Hustler did not require notarization of the release—a requirement that might have dissuaded readers from even attempting to submit a fraudulent release. Nor did Hustler require the model to supply her social security number or driver's license number—

numbers that could have been verified through independent sources. When receiving a collect call, the researcher never asked the party making the collect call to allow the conversation to be recorded, nor did he even call back the number from which the telephone call allegedly had been made prior to relying on the information received from the call. In addition, he never called directory assistance to identify a telephone number for Sabrina Gallon in the Syracuse area, nor for the photographer identified as Ronald Otis Jennings on the release form. We need not decide whether Hustler's verification system was adequate, however, because it is obvious that the research department did not even follow its own procedures in an attempt to verify the validity of the release in question.

12. Although Hustler magazine had been constructively put on notice of deficiencies in its verification process due to numerous incidents similar to this one, they did virtually nothing to alter their verification procedures regarding the screening of submissions to the Beaver Hunt section of the magazine.

13. The defendant, Hustler's verification procedure and model release form applicable to this October, 1983 publication of Sabrina Gallon's photograph was reviewed and considered by Richard F. Hixson, a professor of communication law and communication history at Rutger's University. He concluded that "the form deviated from good and accepted practice in the field of journalism for securing releases to publish photographs." Mr. Hixson also found that the Hustler model release form submitted under the name Sabrina Gallon was in violation of Hustler's own verification policies contained in Exhibit "9" by way of the fact that it lacked a telephone number, the different colored ink utilized and the unclear "legal signature" on the release form. In conclusion, Mr. Hixson testified that the verification process used by Hustler Magazine, Inc. was not only violated within the context of their own written policy, but was in and of itself flawed and insufficient since it ultimately is no verification at all.

14. The Court finds that Hustler acted with reckless disregard for whether the information in the release was true and whether Ms. Gallon actually consented to the publication of her picture in "Beaver Hunt." The Court also finds that Hustler published the picture of Ms. Gallon and the accompanying copy with reckless disregard for the offensiveness of the material. Hustler knew or should have known that the publication of the material in question would be highly offensive if the proper consent had not been given. Consequently, by recklessly disregarding whether valid consent had been secured, Hustler recklessly disregarded the offensiveness of the material it published.

15. The Court finds that by publishing the picture of Ms. Gallon in the nude, Hustler made a public disclosure of private facts, the publication of which would be highly offensive to a reasonable person of ordinary sensibilities. The Court also finds that the picture was of no legitimate concern to the public.

16. The Court finds that by publishing Ms. Gallon's picture in the nude, Hustler placed her in a false light. The publication of her photograph in "Beaver Hunt" indicated that she had consented to the publication since the solicitation for the pictures instructs the models to fill out a release form. The publication of the sexual fantasy attributed to Ms. Gallon also placed her in a false light since she never had such a fantasy, nor consented to the publication of such information. The false light in which Ms. Gallon was placed would be highly offensive to a reasonable person. Furthermore, Hustler acted with reckless disregard for the falsity of the publicized matter and the false light in which Ms. Gallon would be placed by the publication.

17. As a result of the publication of her picture in *Hustler*, Ms. Gallon was emotionally damaged. The Plaintiff claims that as a result of the photos publication she became uncomfortable, did not engage in social or extra-curricular activities and was selfconscious. In addition, Ms. Gallon related four specific incidents directly related to the publication of the nude photo that

upset her. The Court has no reason to question Ms. Gallon's veracity.

18. In connection with this lawsuit, the plaintiff was examined by two psychiatrists, Dr. Thomas Falci, retained by the plaintiffs, and Dr. Geoffrey M. Margo, retained by the defendant. Dr. Falci diagnosed the plaintiff as suffering from an "adjustment disorder" as described in the Diagnostic and Statistical Manual of Mental Disorders (hereinafter "DMS III"). He found that this adjustment disorder was precipitated by and due to the stress caused to the plaintiff by the publication of her photograph in Hustler Magazine. As a result of this publication he found that she suffered a major loss of self-esteem, withdrew from contact with others, felt she had little control over her life, and essentially felt like an ant among giants. It was his opinion that her condition could be improved by use of psychotherapy, although the length of treatment required was unascertainable.

19. Dr. Margo also examined the plaintiff and found that she was suffering from a DMS III mild chronic "post-traumatic stress disorder". He further opinioned that the Plaintiff was suffering from a long standing feeling of worthlessness, related to her strict upbringing that created a lot of shame and guilt which she dealt with by the psychological defense mechanisms of denial and repression. Dr. Margo agreed that the publication of the photo in Hustler Magazine might have been one of the causes of the Plaintiff's psychological problems. He also agreed that her condition could be treated with psychotherapy.

20. Both experts agreed that Ms. Gallon was disturbed and in need of medical treatment, i.e. psychotherapy. Each agreed that the publication of the photo was a traumatic event in her life, and that she was psychologically harmed by its publication. Although Dr. Margo seemed to place a greater emphasis on the past events in Plaintiff's life, he agreed that the publication of the photograph in the October, 1983 edition of Hustler Magazine was a cause of the psychological and emotional damages that she was suffering from. Therefore,

the only real difference between the two expert's testimony was not on causation, but rather on the degree of damage attributable to the publication of her nude photograph in Hustler Magazine.

### Conclusions of Law

[1, 2] 1. An act, omission or violation of a statute is a proximate cause of an injury if it was a substantial factor in bringing about the injury, that is, if it had such an effect in producing an injury that reasonable men would regard it as a cause of the injury. Plaintiff need not show causation with absolute certainty nor exclude every other possible cause. *Spett v. President Monroe Bldg. Corp.*, 19 N.Y.2d 203, 278 N.Y.S.2d 826, 225 N.E.2d 527 (1967); *Wragge v. Lizza Asphalt*, 17 N.Y.2d 313, 270 N.Y.S.2d 616, 217 N.E.2d 666 (1966). It is sufficient that facts and circumstances are shown from which causation may be reasonably inferred. *Bolte v. City of New York*, 22 N.Y.2d 817, 292 N.Y.S.2d 912, 239 N.E.2d 653 (1968). In fact, there may be more than a single proximate cause. When two parties by separate illegal acts cause injury and it is not possible to determine in what proportion each contributed, either party is responsible for the whole injury.

2. The defendant clearly violated § 51 of the Civil Rights Law, which provides, in pertinent part:

> Any person whose name, portrait or picture is used within this state for advertising or the purposes of trade without the written consent first obtained ... may maintain an equitable action ... and may also sue and recover damages.

The defendant clearly is in violation of section 51 of the Civil Rights Law, and such violation proximately caused emotional harm to the plaintiff which now requires psychotherapy as treatment.

3. In view of the persistent mental anguish suffered by Plaintiff Sabrina Gallon, this Court holds that $30,000.00 would fairly and reasonably compensate her for the damages proximately caused by Defendant Hustler Magazine, Inc.'s misconduct.

4. Any finding of fact more properly characterized as a conclusion of law shall

be so considered, and any conclusion of law more properly characterized as a finding of fact shall be so considered.

IT IS SO ORDERED.

## ORDER

■ This is an addendum to the Order of March 9, 1990 of this Court granting the Plaintiff, Ms. Sabrina Gallon, damages in the amount of $30,000.00 for mental anguish suffered by her and proximately caused by Defendant Hustler Magazine, Inc.'s misconduct.

The Court finds that the misconduct of Defendant Hustler Magazine, Inc., did not rise to the level of intentional or wanton misconduct required for this Court to grant the Plaintiff punitive damages. Therefore, the damages awarded by this Court in its Order of March 9, 1990 are in full for the Defendant's misconduct, and this Court denies the punitive damage relief requested by the Plaintiff.

IT IS SO ORDERED.